2020 IL App (1st) 162107-U

No. 1-16-2107

Order filed January 10, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 12913 |
| | ) | |
| RODNEY ROBINSON, | ) | Honorable |
| | ) | William G. Lacy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Hoffman and Justice Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's conviction for aggravated battery with a firearm over his contention the evidence was insufficient to prove him guilty beyond a reasonable doubt. The State did not commit reversible error during closing arguments. Defendant's 10-year sentence was not excessive.

¶ 2    Following a jury trial, defendant Rodney Robinson was found guilty of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2012)) and sentenced to 10 years' imprisonment. On appeal, he contends (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the

State committed prosecutorial misconduct by misrepresenting the evidence during closing arguments, and (3) his sentence is excessive. For the following reasons, we affirm.

¶ 3      Defendant was charged by indictment with attempted murder and aggravated battery with a firearm in connection with the shooting of Deuntrell Murry on May 30, 2013.

¶ 4      At trial, Mr. Murry testified that he was 20 years old on May 30, 2013. As he was walking alone on 64th Street at about 2 p.m., he saw defendant, whom he identified in court, standing in the middle of the block on South Talman Avenue. Mr. Murry had known defendant for about six years. He knew defendant by the name "Boo Man" but did not know his real name. Mr. Murry had an altercation with defendant "a long time ago." When asked about the nature of their altercation, Mr. Murry stated he was unsure, but it "seemed like it was just scared of a person at the time. I never saying nothing to him, never did nothing to him. When I did see him, he run, and hide something, like that."

¶ 5      When Mr. Murry approached, defendant was holding a basketball in his hand and standing in front of a basketball hoop with two other men. Defendant did not do anything as Mr. Murry walked by them; "they" just started talking. Mr. Murry did not hear defendant or the two men say anything. The State then asked, "You stated that they had been whispering at one point, is that right?" Defense counsel objected, and the court sustained the objection.

¶ 6      As Mr. Murry continued walking, he heard a gunshot from behind him. He subsequently heard two or three additional shots and felt pain in his right leg. Upon feeling the pain, Mr. Murry attempted to run, but when he placed pressure on his leg, it snapped and he fell to the ground, scraping his hands. He heard approximately six more shots coming from behind him. Mr. Murry stayed on the ground and tried to make sure "they weren't running up on [him]." When he

eventually looked back, he saw two of the three men that had been in front of the basketball hoop. He did not recognize either of the men and watched them run toward Talman. One of the men wore a black shirt and the other wore a white shirt.

¶ 7    Mr. Murry was eventually transported to the hospital, where he had surgery on his leg. He spoke with police at the hospital and informed them that defendant was one of the men who was standing in front of the basketball rim. The police showed him a photographic array; Mr. Murry did not identify anyone in it. Defendant's photo was not in the array.

¶ 8    On June 11, 2013, Mr. Murry spoke with police in his home. They showed him a single photograph, and Mr. Murry identified the person in the picture as defendant, who was one of the people at the basketball rim when "they" started shooting. He told police that defendant had had a grudge against him for a long time, although he did not know the reason. On the same date, Mr. Murry viewed a physical lineup and identified defendant.

¶ 9    Mr. Murry gave a statement to assistant State's Attorney (ASA) Eleanor San at his home. He was not forced or threatened to give a statement and was permitted to make necessary changes. Mr. Murry acknowledged that he signed each page of the statement and initialed the corrections he made. He agreed to the truth of everything contained in his statement by signing it. Mr. Murry stated that he had observed defendant with a black shirt, and another person in a white shirt with "dreads" standing where the gunshots originated. The second person was one of the men he had seen standing with defendant in front of the basketball rim. As he was on the ground after being shot, defendant and the other person ran eastbound toward 64th and Talman.

¶ 10    Mr. Murry also acknowledged testifying before the grand jury that, when he looked behind him, he saw two of the three men who had been standing in front of the basketball rim. One of

those men was defendant. No one else was standing on the street after the shooting. When he turned to look behind him, defendant and the other man ran.

¶ 11    Mr. Murry had known Cassandra Robinson, defendant's sister, for 12 years. They were friends on Facebook. Ms. Robinson contacted Mr. Murry via Facebook prior to an earlier court date and asked whether Mr. Murry was "going to court with [her] brother."

¶ 12    Mr. Murry confirmed that he had a pending criminal case for contempt of court for failing to appear in the current case and had prior convictions for aggravated assault of a peace officer and burglary from 2014, aggravated unlawful use of a weapon from 2012, and two juvenile adjudications for residential burglary from 2009 and burglary from 2006.

¶ 13    On cross-examination, Mr. Murry testified that he was four years older than defendant. He denied beating defendant up. Mr. Murry did not hear anyone behind him as he walked down 64th Street. No one else was on the sidewalk, aside from the two men he did not recognize after he was shot. Although he informed police at the hospital that defendant was there, he never stated that he saw defendant with a gun in his hand. Mr. Murry did not see defendant shooting at him. His written statement did not state that he either saw defendant with a gun or shooting at him.

¶ 14    When viewing the photo array, the police asked only if Mr. Murry recognized anyone; they did not ask if anyone in the array was the shooter. Mr. Murry told police he recognized defendant when shown a single photograph of him. Defendant was also the only person in the lineup known to Mr. Murry. The other lineup participants were five to six years older than defendant.

¶ 15    Mr. Murry read in court an excerpt from a January 3, 2016, Facebook conversation he had with Ms. Robinson. In the conversation, Ms. Robinson asked whether Mr. Murry was "still going to court on [defendant]." Mr. Murry responded, "Mind yo f*** business." He later said,

"B*** I gotta go toma hoe cause I got locked up n I was gone get there n ad like ion remember s*** b*** don't blow me for I get his a*** cooked n when he do get out yall batter move him out of town cause ima put some holes in his a***. Cause I suppose to come on November 4 b*** I jus got out for not coming b***."

¶ 16    Ms. Robinson did not respond to Mr. Murry's message. He sent another message the same day, saying, "Lol I'm jus playing you worrying about the wrong s*** ima make sure he get out n I ain't gone do none to your brother…He ain't shoot me!!!" Mr. Murry acknowledged telling Ms. Robinson that defendant was not the person who shot him.

¶ 17    Mr. Murry was charged with indirect criminal contempt for failing to appear in court because he did not want to testify against defendant as he "wasn't sure" that defendant was the person who shot him.

¶ 18    On redirect, Mr. Murry agreed that the trial was the first time he was telling his version of events in front of defendant. Defendant was not there when he signed his handwritten statement or when he testified before the grand jury. Ms. Robinson initiated contact with Mr. Murry on Facebook and had accused him of being a "police a*** n***" during their January 3, 2016, conversation. He acknowledged that his Facebook message alluded to him "taking care" of defendant when he was released from jail because defendant "had something to do with [Mr. Murry] getting shot."

¶ 19    The parties stipulated that if called, Dr. James Doherty would testify that Mr. Murry presented to the hospital with a gunshot wound on May 30, 2013. Mr. Murry's wound "seemed to move from back to front." He also had scrapes on his hands consistent with having broken his fall after being shot. He had a comminuted tibia and fibula fracture. Mr. Murry had surgery on his leg

on May 31, 2013. He required a second procedure on July 31, 2013 due to infection and a third procedure on August 2, 2013 to cover the exposed bone.

¶ 20    Jose Angel Diaz Martinez testified that on May 30, 2013, he was driving with his coworker Howard Patton eastbound on 64th Street.[1] Mr. Diaz was driving and Mr. Patton was in the passenger seat. About 2 p.m., he observed a black man, whom he had never seen before, walking westbound toward California Avenue. He also noticed two other black men walking westbound toward California. Mr. Diaz subsequently heard seven or eight gunshots coming from the two men. One of the men was holding a gun with two hands and pointing it toward California. Mr. Diaz turned onto Fairfield Avenue. As he parked, Mr. Patton exited the vehicle and went back to the scene. Mr. Diaz saw the two men run across Fairfield near an alley. Mr. Diaz had a pending contempt of court case for failing to appear in this case on a previous date.

¶ 21    On cross-examination, Mr. Diaz testified that he was still driving when he heard the gunshots and did not duck. He was not able to identify the person he witnessed holding the gun. Mr. Diaz gave a statement to police but could not recall whether he gave a physical description of the men. He was driving "maybe, like" 15 miles per hour.

¶ 22    Mr. Patton testified he was sitting in the passenger seat and could see out of the windows in the van. As they were driving on California and turning onto 64th, Mr. Patton noticed Mr. Murry running on the west side of the street and two other men about 50 feet behind screaming and chasing him. At some point, one of the men pulled out a gun and started shooting. Mr. Patton heard "11, 12, maybe even 13" shots. He identified defendant in court as the shooter. Mr. Diaz continued

---

[1] We refer to this witness as "Mr. Diaz" based on his testimony that he "goes by" that name.

driving during the shooting but Mr. Patton continued to look in the direction of defendant, who was holding the gun.

¶ 23    Mr. Patton, who was 25 to 30 feet from defendant, watched as defendant shot towards Mr. Murry. Defendant was wearing a black shirt, black shorts, and black tennis shoes. The other man was wearing a white shirt, had longer hair pulled back, and was taller than defendant. Mr. Patton, who had experience with firearms, testified the gun defendant was holding was black and a semiautomatic pistol; he saw the shells ejected from the gun. Once Mr. Diaz parked, Mr. Patton went to check on Mr. Murry.

¶ 24    On June 11, 2013, Mr. Patton viewed a physical lineup. Police explained the lineup procedure to him and informed him that the shooter may not be in the lineup and he was not required to make an identification. He identified defendant in the lineup as the shooter. Mr. Patton had a pending case for contempt of court for failing to appear at an earlier date in this case.

¶ 25    On cross-examination, Mr. Patton testified he had never seen defendant before the day of the shooting. Mr. Diaz had been driving less than 10 miles per hour. When he first saw Mr. Murry, Mr. Murry seemed to be in a hurry to get away from the guys that were yelling. Mr. Patton did not pay attention to what they were saying. When he first heard the gunshots, Mr. Diaz pulled over to the side of 64th Street. The shooting took less than 10 seconds. Afterward, the two men stopped, turned around and faced the van "[f]or a few seconds, enough to scare the *** out of [Mr. Patton]." The men then ran, and Mr. Diaz turned onto Fairfield.

¶ 26    Mr. Patton did not recall describing the shooter to police as wearing a black shirt and blue jeans with boxers hanging out. He also denied describing the shooter's height to police. Mr. Patton did not recall one person in the lineup appearing younger than the others.

¶ 27    Chicago police detective Jerry Pentimone testified that he spoke with Mr. Murry in the hospital on May 30, 2013. Mr. Murry told Detective Pentimone that he saw defendant (who he knew as "Boo Man") running from the location of the shooting. Mr. Murry did not identify anyone from a photo array. Detective Pentimone later showed Mr. Murry a photo, and Mr. Murry recognized defendant. Both Mr. Patton and Mr. Murry individually identified defendant in the lineup. Mr. Murry stated that defendant was running away after he had been shot, while Mr. Patton stated that defendant pointed a weapon at the victim and shot him.

¶ 28    On cross-examination Detective Pentimone testified that on the day of the shooting, Mr. Diaz described the shooter as wearing no shirt and dark-colored pants. Detective Pentimone's general progress report of the case showed that Mr. Diaz reported the shooter was wearing no shirt and shorts but did not describe what color they were. On June 11, 2013, at about 10 a.m., defendant was brought to the office at the Dunbar High School and Detective Pentimone handcuffed him and informed him he was under arrest for aggravated battery.

¶ 29    The other participants in the lineup were "approximately, at least, [four] to [five] years older" than defendant. Mr. Murry did not tell Detective Pentimone whether he knew anyone else in the lineup aside from defendant. Prior to the lineup, Detective Pentimone had shown Mr. Murry the single photo of defendant. Detective Pentimone did not show Mr. Patton anything prior to the lineup.

¶ 30    ASA Eleanor San testified that, on June 11, 2013, she took a handwritten statement from Mr. Murry at his residence. She also spoke with defendant, at the police station, that evening. ASA San initially spoke with defendant in a 10 feet by 12 feet holding cell with Detective Pentimone

and defendant's mother, Mary Moore, present. ASA San informed defendant of his *Miranda* rights, and defendant indicated he understood them. Their conversation lasted between 10 and 15 minutes.

¶ 31 On June 12, 2013, at about 2 a.m., ASA San spoke with defendant again in the same holding cell; Detective Pentimone and Ms. Moore were present. ASA San again informed defendant of his *Miranda* rights, and he again indicated he understood them. Defendant was not handcuffed for either conversation. ASA San was informed that defendant had been given food, although she did not see him with food. There were no threats or promises made to defendant while she was with him.

¶ 32 Before taking defendant's statement, ASA San gave defendant his *Miranda* rights a third time. Ms. Moore was present the entire time. ASA San explained to them that defendant would tell her what happened, she would type it and print it out, and they would go over the statement together. Defendant would be given the opportunity to make changes or corrections to the statement and then they would all sign the statement to ensure its accuracy. ASA San identified People's Exhibit Number 50, which consisted of defendant's statement and a photo of defendant and a photo of Ms. Moore, in which each are holding the statement. The photos were taken during the interview to demonstrate that defendant and Ms. Moore were in "good condition" and the statement was voluntarily given. Defendant signed the statement under his rights, which were listed out, at the bottom of each page. Ms. Moore, ASA San, and Detective Pentimone also signed the statement. Defendant made a single correction to the statement.

¶ 33 Defendant's statement was admitted into evidence and published to the jury. In the statement, defendant relayed that he was 16 years old and at the police station with Ms. Moore, his mother and guardian. He was in ninth grade and sometimes went by the name Boo Man. On May

30, 2013, he was on the 6400 block of South Talman where his friend "Little Don" lived. He was playing basketball outside with Little Don, "Dough Boy," "Pooh Mice," Brandon Weeks, who was Ms. Moore's friend, and Pookey, who was Little Don's cousin. While playing, Mr. Murry walked past. Dough Boy reminded defendant that Mr. Murry had previously threatened to shoot defendant or defendant's sister or mother if he could not catch defendant's brother. Dough Boy asked what defendant was going to do about Mr. Murry and defendant responded, "just leave it alone." Dough Boy again said that Mr. Murry threatened to shoot defendant's mother and sister. Defendant was scared that Mr. Murry would follow through on this threat. Dough Boy told Pooh Mice to get a gun, and Pooh Mice retrieved a gun, which Dough Boy handed to defendant. The gun was black on top and silver on the bottom and the handle. Defendant walked up Talman and turned onto 64th toward Mr. Murry. When he saw Mr. Murry pass the alley, he said "Hey" to him. Mr. Murry ran and defendant fired the gun more than once, although he could not recall how many times. Defendant aimed the gun low and held it with one hand. He blacked out because he was scared.

¶ 34    After firing the gun, defendant saw Mr. Murry on the ground. Defendant gave Dough Boy the gun and did not know what Dough Boy did with it. Defendant then hurried away. As he waited for a bus, he bumped into Ms. Moore, who was getting off another bus and they went home together.

¶ 35    On cross-examination, ASA San acknowledged that Mr. Murry never told her he saw defendant with a gun or that he saw defendant shoot him. When taking Mr. Murry's statement, ASA San was "mostly" asking Mr. Murry questions. She did not recall specifically asking Mr. Murry who shot him.

¶ 36    Chicago police officer Anthony Beam, an evidence technician, testified he processed the scene of the shooting. He found 11 fired cartridge casings, which were from different manufacturers but were all .40-caliber from a semiautomatic gun. Officer Beam then recovered the casings and inventoried them. He did not swab them for fingerprints or DNA because firing a gun typically destroys that type of evidence.

¶ 37    Forensic scientist Tonya Brubaker from the Illinois State Police crime lab testified as an expert in firearms and firearm identification. She tested the 11 fired cartridge casings, which were all .40-caliber Smith and Wesson. In Ms. Brubaker's opinion, the cartridges were all fired from the same firearm. However, she did not receive a firearm to test.

¶ 38    The State rested.

¶ 39    Detective Mark Cunningham testified that during the investigation he interviewed Mr. Patton, who relayed that he observed two men, one of whom was the shooter. On May 30, 2013, Mr. Patton described the shooter as approximately 5'7" with a medium build and wearing a black shirt and blue jeans with boxers hanging out. Mr. Patton described the second man as approximately 5'11" with a medium build and wearing no shirt and blue jeans.

¶ 40    Brandon Weeks, who was 30 years old and lived on the 6300 block of South Talman, testified that at about 1:30 p.m. on the day of the shooting, he set up a basketball rim at 64th and Talman. Pooh Mice, Dough Boy, Pookey, Little Don, and defendant were with him playing basketball. As they played, they heard more than 10 gunshots. When they heard the shots, "[e]verybody took off." Mr. Weeks saw defendant give Little Don $2 and then leave to walk toward the bus stop on 63rd. Dough Boy and Pooh Mice did not leave. Mr. Weeks never saw defendant with a gun. He denied seeing anyone hand defendant a gun. About two weeks after the

shooting, defendant's mother contacted Mr. Weeks and he learned defendant was incarcerated, although he did not know the reason. Neither police nor any investigators reached out to Mr. Weeks regarding defendant's arrest. Mr. Weeks has a prior conviction for attempted residential burglary from 2014 and a pending case for unlawful use of a weapon.

¶ 41    On cross-examination, Mr. Weeks testified he had lived in his neighborhood for 30 years. It was common to hear gunshots and for everyone to run. In 2013, he saw defendant, Pooh Mice, Dough Boy, and Pookey every day in his neighborhood. Defendant was one of the youngest men of those present on the day of the shooting. Mr. Weeks did not know Mr. Murry, so he would not have known if he walked by their basketball game. Mr. Weeks denied that Ms. Moore explained defendant's charges to him. He did not speak with police about the shooting or try to report what he knew because he was scared. Mr. Weeks gave a statement of what he remembered to defendant's attorney in September 2015, more than two years after the shooting because they learned he was present that day. He learned about defendant's charges from defendant's attorneys.

¶ 42    Defendant testified that at the time of the shooting, he was living on the 6300 block of South Talman. He was 16 and in ninth grade. He acknowledged that he was known as Boo Man. On the day of the shooting, he got out of school between 1 and 2 p.m. and visited Little Don at 64th and Talman. He played basketball with Little Don, Pookey, Dough Boy, Pooh Mice, and Mr. Weeks, who was friends with Ms. Moore. He did not know the other men's real names. Dough Boy and Pooh Mice were older than him, but he did not know their ages. Pooh Mice was short, light-skinned, and "kind of chubby," while Dough Boy was a "little taller," "kind of chubby," and had "dreads."

¶ 43    Defendant knew Mr. Murry for a "long time" because Mr. Murry went to school with defendant's sister. On the date in question, about 2 p.m., defendant saw Mr. Murry walking down Talman. The two did not interact. Defendant and the other men continued their basketball game. About five minutes after Mr. Murry had walked by, Dough Boy and Pooh Mice left in a car. At some point, defendant and the remaining men heard gunshots. Defendant ran to Little Don's porch. Little Don gave him $2 so he could take the bus home. At that point, defendant did not know that Mr. Murry or anyone else had been shot. He denied shooting anyone, firing a gun, or taking a gun from Dough Boy.

¶ 44    On June 11, 2013, while at school, Detective Pentimone "grabbed" and handcuffed defendant but did not tell defendant that he was under arrest. He was informed that police were taking him to the police station to question him about a shooting. At the police station, he was placed in a "little room" without a window and held for about 18 hours.

¶ 45    Detective Pentimone first questioned defendant about 12:30 p.m. Defendant told Detective Pentimone he did not know about Mr. Murry getting shot. At 11:30 p.m., Detectives Pentimone and Cunningham questioned him again. Defendant told the detectives he was playing basketball on the day of the shooting. He repeated that he did not know who shot Mr. Murry. He denied telling the detectives that he had anything to do with Mr. Murry's shooting, although he acknowledged telling them that Dough Boy and Pooh Mice had left in a car.

¶ 46    Detective Pentimone told defendant that they had video surveillance of defendant, Mr. Murry identified him as the shooter, and other witnesses said defendant was on the scene running with a gun. Although defendant denied being involved in the shooting, the detectives informed him that they "got [him] already." Defendant was scared, had never been to the police station

before, and had never been in a lockup or questioned by police. The detectives told him that he could go home if he gave a statement. He agreed to give a statement at 2 a.m. Ms. Moore, ASA San, and Detective Pentimone were present. Defendant had not had anything to eat between 10 a.m. when he was arrested and 2 a.m. the following morning. Ms. Moore brought defendant food after 2 a.m. Defendant acknowledged that his mother was present during the questioning between "11:00 and 2:00."

¶ 47 Defendant identified the statement. He did not know the meaning of "aggravated battery with a firearm," "court of law," "assistant State's Attorney," and "constitution." He did not understand what it meant to be tried as an adult. Defendant had never been in a courtroom before and did not know the function of a lawyer. He knew what *Miranda* rights were at the time of trial based on conversations with his lawyer but did not understand them in 2013. Defendant made up the contents of his statement because he was scared and the detectives continued to question him. He did not know he would be charged with attempted murder if he gave a statement.

¶ 48 Defendant read in court the first paragraph of his statement:

> "Rodney states that assist – [ASA San] advance -- advance him of this constitutional rights. Rodney states that he understand that the right to remain silent means that he does not have to answer any question. Rodney states that he understand that when he was told his answer can be used against him, that it's -- it mean what he says can be used in court in front of a judge or jury."

Defendant acknowledged that he read better at trial than he could in 2013. He denied shooting or trying to kill Mr. Murry.

¶ 49    On cross-examination, defendant testified that on the date of the shooting, although he had been living on Talman, he needed to take a bus to a new house his family was moving into on Michigan Avenue. Defendant and his family members did not have issues with Mr. Murry. He denied that he spoke with his friends about Mr. Murry walking past their game. Defendant could not recall how much time elapsed between Dough Boy and Pooh Mice leaving in a car and hearing the gunshots. He did not recall whether Dough Boy had a gun that day. It was unusual to hear gunshots in his neighborhood.

¶ 50    On the day he was arrested, he did not learn that the police were going to question him about a shooting until he arrived at the police station. However, in the car on the way to the police station, the detectives first accused him of a shooting on 61st Street and King Drive. They then accused him of shooting Mr. Murry.

¶ 51    Defendant denied speaking with ASA San twice. He did not know when Ms. Moore arrived at the police station but agreed that she was there when he gave his statement. Defendant signed his statement under the section listing the rights that he did not understand. He also signed under his *Miranda* rights and at the bottom of the page next to Ms. Moore's signature. Defendant was informed of his rights several times, but he did not understand them. Specifically, he did not understand the parts about the jury and "use in front of the judge," "court," and "lawyer." Although ASA San read the statement to him, he did not understand it and Ms. Moore could not help him understand because she "barely knew what was going on. She came in the morning."

¶ 52    Before ninth grade, defendant passed every grade, including eighth grade exams; he did not remember passing an exam on the constitution. Defendant had to repeat the third grade. He

became better at reading while incarcerated. Defendant read the first paragraph of his statement aloud to ASA San in 2013.

¶ 53    After the defense rested, the court instructed the jury that the parties' closing arguments were not evidence and were merely "what they believe the evidence has shown. The arguments should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Should you hear any argument that you feel is not supported by the evidence, you should disregard that comment."

¶ 54    In closing, the State argued that the evidence showed defendant was the shooter. Mr. Murry walked past defendant, who armed himself with a weapon and "planned his attack and followed his prey." Mr. Murry was ambushed because he was shot from behind. The stipulation of the doctor's testimony showed Mr. Murry's wound entered his leg through the back and exited through the front. There were 11 shell casings recovered at the scene, showing 11 shots had been fired, all from the same gun. Although Mr. Murry did not see who shot him because he was shot from behind, after being shot, Mr. Murry looked behind him and saw defendant fleeing. The prosecutor went on,

> "[STATE]: Yes, [Mr. Murry] did get on the stand and he was hesitant and scared.
>
> [DEFENSE COUNSEL]: Objection. There's not showing he was scared. He never said he was scared.
>
> THE COURT: Objection overruled. There's no talking objection. Proceed.
>
> [STATE]: He got on that stand. He was hesitant. You saw his demeanor. Wouldn't you be hesitant? The only difference between his testimony on the stand was when he was talking to the police, he was telling you what was happening. When he talked to the State's

Attorney, he told her what happened. When he did the lineup, he said what happened. The only difference in this courtroom is Boo Man is sitting there.

[DEFENSE COUNSEL]: Objection again.

THE COURT: Objection is overruled.

[STATE]: So would it be right to be scared when you're sitting in front of the man that shot at you 11 times? None of us have been in that situation. Would you be hesitant to finger the person that fired that many shots?

[DEFENSE COUNSEL]: Objection again.

THE COURT: Okay. Objection's overruled.

[STATE]: We can only imagine what it means to walk in his shoes."

¶ 55    The State went on to argue that the defense case was "convoluted" because Mr. Weeks' testimony was inconsistent with defendant's, where they testified differently about whether Dough Boy and Pooh Mice were present during the shooting. The State also pointed out that defendant and Mr. Weeks both testified that defendant lived on Talman, near the shooting, yet defendant also testified that he needed to take a bus home. Finally, the State argued that defendant "got all the details right [in his statement] for someone that wasn't there."

¶ 56    In closing, defense counsel focused on defendant's young age at the time of his arrest and that he made a mistake by giving a statement. Counsel emphasized that Mr. Murry admitted he knew defendant was not the shooter and did not want to testify for that reason. Further, counsel noted the inconsistencies between Mr. Diaz's testimony and Mr. Patton's with respect to their descriptions of the offenders and whether Mr. Diaz pulled over during the shooting or continued driving. Counsel argued the lineup identifications were unreliable because the other participants

were older than defendant. With respect to the State's argument regarding Mr. Murry being afraid of defendant, defense counsel argued that defendant had no criminal history or history of violence, was four years younger than Mr. Murry, and there was no evidence that showed defendant made any threats to Mr. Murry. Rather, the State "made up a story."

¶ 57 In rebuttal, the State contended that everyone agreed on the day of the shooting defendant was playing basketball with other men and Mr. Murry walked past. The State argued,

> "[STATE]: The defendant was whispering. The victim tells you that the defendant was whispering when he walked by.
>
> [DEFENSE COUNSEL]: Objection. That's a misstatement of the evidence.
>
> THE COURT: The jury's heard the evidence. Anything not supported by the evidence should be disregarded."

¶ 58 The State continued that Mr. Murry was "vulnerable" that day and there were unresolved issues between the two men. Nevertheless, Mr. Murry walked past defendant, "[t]he person who's whispering about him as he walks by, by his own admission." Additionally, the State noted that defendant's sister had initiated contact with Mr. Murry and asked whether he was still going to testify against defendant and whether he would be a "police a*** n***." Based on those circumstances, "[o]bviously, Mr. Murry was "a little spooked by Boo Man in court, right?"

¶ 59 Following closing arguments, the court again instructed the jury that,

> "Closing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing

arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 60    The jury found defendant guilty of aggravated battery and not guilty of attempted murder.

¶ 61    At the hearing on his posttrial motion for a new trial, defendant argued, *inter alia*, that the State's closing and rebuttal arguments were improper because there was no evidence showing that Mr. Murry was afraid of defendant or intimidated by defendant's presence at trial. The State responded that a "number of factors" suggested that Mr. Murry was intimidated by defendant. Mr. Murry did not come to court on prior occasions, had a pending contempt case, and had to be arrested and brought in to testify against defendant. Moreover, the State argued that Mr. Murry told a different version of events in front of defendant than he had on prior occasions when defendant was not present. The State pointed out that the Facebook post that the defense had introduced showed defendant's sister was contacting Mr. Murry prior to an earlier court date. The State argued that the evidence, taken together, "suggested there was a possibility that the victim was intimidated" and was a conclusion that the jury could draw from the evidence presented.

¶ 62    The court denied defendant's motion, ruling "[T]here was enough circumstantial evidence that would allow the State to draw a reasonable inference from that evidence to make that argument."

¶ 63    At sentencing, the State argued in aggravation that defendant's presentence investigation report (PSI) showed nothing "particularly mitigating." Defendant had no substance abuse issues in his family, no issues with his family or home life, and was raised in a stable environment. At the time of the offense, defendant attended high school, was supported by his mother, and had friends that were stable, supportive, and good influences. The State noted that, in the instant case,

defendant discharged a firearm 11 times during the day on a public street, indicating that he posed a threat to the general public. The State asked for a "substantial sentence" in order to deter others from committing similar crimes.

¶ 64    In mitigation, defense counsel argued defendant's young age and lack of criminal record showed he was deserving of the minimum sentence. Counsel pointed out that defendant came from a decent home but was with older men who "psychologically intimidated" him to commit the offense. Counsel described the shooting as an aberration in defendant's life. Further, the evidence showed Mr. Murry's life was not "ruined" given that he denied that defendant was the shooter and did not want to testify against him. Counsel also noted defendant had been incarcerated for three years at the time of trial and had obeyed rules in jail and would continue to obey laws upon his release.

¶ 65    Ms. Moore gave a statement in mitigation. She told the court that defendant had never been in trouble or incarcerated before and was a good student.

¶ 66    The court sentenced defendant to 10 years' imprisonment. The court considered defendant's PSI, the parties' arguments, Ms. Moore's statement, the nature of the charges, and the statutory factors in aggravation and mitigation. While the court did not believe defendant deserved the maximum 30-year sentence "or close to that," it also did not believe defendant deserved the minimum and found 10 years "appropriate." Counsel orally asked the court to reconsider defendant's sentence. The court did not rule on the oral motion and proceeded to advise defendant of his appeal rights. This appeal follows.

¶ 67    On appeal, defendant first contends that the State failed to prove him guilty beyond a reasonable doubt because Mr. Murry did not identify him as the shooter, the eyewitness identification was unreliable, and his custodial statement was not knowing and voluntary.

¶ 68    On a challenge to the sufficiency of the evidence, we inquire " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison,* 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In so doing, we draw all reasonable inferences in favor of the State (*Davison*, 233 Ill. 2d at 43), and we do not retry the defendant (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The State must prove each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). We will not overturn a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Givens,* 237 Ill. 2d 311, 334 (2010). It is well established that "[t]he testimony of a single witness, if it is positive and the witness credible, is sufficient to convict." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Further, it is within the province of the trier of fact "to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *Siguenza-Brito*, 235 Ill. 2d at 228. A defendant's claim that a witness was not credible, standing alone, is insufficient to reverse a conviction. *Id.*

¶ 69    In this case, defendant was convicted of aggravated battery with a firearm. In order to sustain defendant's conviction for this offense, the State was required to prove that he, in committing a battery, knowingly discharged a firearm and caused injury to another person. 720 ILCS 5/12-3.05(e)(1) (West 2012). To prove defendant committed a battery, the State had to show

defendant intentionally or knowingly caused injury to another person. 720 ILCS 5/12-3 (West 2012).

¶ 70    After viewing the evidence in the light most favorable to the State, we find that a rational trier of fact could conclude that defendant committed aggravated battery with a firearm beyond a reasonable doubt. The evidence at trial established that Mr. Murry walked past defendant while he was engaged in a basketball game. After Mr. Murry passed, defendant followed him to 64th Street where he pointed a gun in Mr. Murry's direction and fired 11 shots. One shot hit Mr. Murry's leg, causing his leg to break and necessitating three subsequent surgeries. Mr. Murry did not identify defendant as the shooter, but acknowledged defendant was on the scene and that they had unresolved issues. In his prior statement and grand jury testimony, Mr. Murry also identified defendant as one of two men fleeing after he had been shot. While he was driving, Mr. Diaz observed two men following Mr. Murry and heard gunshots coming from where the two men were walking. Mr. Diaz could not identify the shooter. Mr. Patton observed defendant and another man quickly following Mr. Murry and yelling at him. Mr. Patton then witnessed defendant pull out a black gun and fire shots toward Mr. Murry. Mr. Patton was familiar with firearms and recognized the gun used as a semi-automatic gun, which was confirmed when the cartridge cases were later recovered from the scene. Mr. Patton identified defendant as the shooter in a physical lineup less than two weeks later.

¶ 71    Upon his arrest, defendant gave a custodial statement confessing to the shooting and giving details that Mr. Murry walked past defendant while he played basketball. Dough Boy reminded defendant that Mr. Murry had threatened defendant and his family and asked what defendant was going to do about the threats. Dough Boy then gave defendant a black and silver gun. Defendant

walked toward Mr. Murry, said "hey," and fired the gun multiple times, aiming low. Mr. Murry was on the ground when defendant hurried away.

¶ 72    We find that this evidence, taken in the light most favorable to the State, was sufficient to enable a rational trier of fact to find that defendant knowingly caused injury to Mr. Murry by discharging a firearm.

¶ 73    In reaching this conclusion, we are unpersuaded by defendant's contention that because Mr. Murry did not identify him as the shooter, the evidence was so improbable that it amounted to reasonable doubt of his guilt. Although Mr. Murry testified he "wasn't sure" that defendant was the shooter, he placed defendant at the scene. Mr. Murry also testified that the gunshots came from behind him. Based on this, it is not unreasonable to infer that Mr. Murry simply did not see his shooter. Additionally, Mr. Murry stated that after he was shot, he observed defendant running from behind him. Combined with the rest of the evidence, this supports an inference that defendant was the shooter. "A trier of fact is not required to disregard the inferences that normally flow from the evidence or to seek out all possible explanations consistent with a defendant's innocence and elevate them to reasonable doubt." *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 11.

¶ 74    More importantly, however, the evidence against defendant did not consist solely of Mr. Murry's testimony. As previously noted, Mr. Patton identified defendant in a lineup as the shooter, and defendant gave a custodial statement confessing to the shooting.

¶ 75    We are similarly unpersuaded by defendant's contention that Mr. Patton's identification was unreliable. When assessing identification testimony, we rely upon the factors set forth in *Neil v. Biggers*, 409 U.S. 188 (1972). *People v. Branch*, 2018 IL App (1st) 150026, ¶ 25. The factors to be considered in evaluating the likelihood of misidentification include (1) the opportunity of the

witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199-200.

¶ 76    We find that the majority of the *Biggers* factors weigh in favor of the State with regard to Mr. Patton's identification of defendant. First, Mr. Patton had ample opportunity to view defendant at the time of the crime. Mr. Patton was in the passenger seat of Mr. Diaz's van and could see out of all the windows. The record shows, when Mr. Patton observed the shooting, it was during the day and he was 25 to 30 feet away from the shooter. While he testified that the shooting lasted only 10 seconds, he also observed defendant following Mr. Murry prior to the shooting and Mr. Murry walking fast to get away from defendant and the second man. Mr. Patton then watched defendant pull out a gun and shoot at Mr. Murry. Following the shooting, defendant faced Mr. Diaz's vehicle "[f]or a few seconds" to the point where Mr. Patton was scared.

¶ 77    Second, Mr. Patton's degree of attention also weighs in favor of the State. Mr. Patton gave a detailed description of defendant's actions during the course of the shooting and the color of the gun used. He testified he was close enough to see the shells being ejected from the gun and observed defendant when he faced the van following the shooting. Where a witness's testimony is detailed, descriptive and indicates that he was acutely aware of what was happening during the encounter, a court may find that the witness's degree of attention was sufficient to render his or her identification of the defendant reliable. *In re J.J.*, 2016 IL App (1st) 160379, ¶ 30; see also *Branch*, 2018 IL App (1st) 150026, ¶ 26 (testimony regarding details demonstrates a high degree of attention at the time of a shooting). With regard to the gun, this court has cautioned that

"there is a tendency of [witnesses] to focus on weapons rather than the offender's face." *J.J.*, 2016 IL App (1st) 160379, ¶ 30. However, in this case, we find this concern is minimized where Mr. Patton testified he observed defendant both before and after the shooting, indicating there were various instances where the gun was not the focus of his attention.

¶ 78    The third *Biggers* factor is the sole factor that arguably weighs in favor of defendant. Although Mr. Patton testified at trial that the shooter was wearing a black shirt, black pants, and black shoes on the day of the shooting, Detective Cunningham testified that Mr. Patton reported to police that the shooter in a black shirt and blue jeans with boxers hanging out. At trial, Mr. Patton also testified that he did not recall giving a description of the shooter's height, but Detective Cunningham testified that Mr. Patton reported the shooter was approximately 5'7".

¶ 79    The fourth *Biggers* factor is neutral in this case because the record does not show the level of certainty Mr. Patton demonstrated at the confrontation. That said, we note that the record also does not show that Mr. Patton wavered in his identification of defendant.

¶ 80    Finally, the fifth *Biggers* factor—the length of time between the occurrence and the identification—also weighs in favor of the State. Mr. Patton identified defendant on June 11, 2013, less than 2 weeks after the shooting. See *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 97 (finding a one-week and a two-week delay between crime and identification a "relatively short time").

¶ 81    Because the majority of the *Biggers* factors weigh in favor of the reliability of Mr. Patton's identification of defendant, we do not find his identification rendered the evidence insufficient to support defendant's conviction.

¶ 82    In support of this conclusion, we note that, in addition to the *Biggers* factors, courts also consider the totality of the circumstances when reviewing the reliability of an identification. *People v. Dereadt*, 2013 IL App (2d) 120323, ¶ 24 (citing *Biggers*, 409 U.S. at 199-200). Here, as mentioned, we are also presented with defendant's own statement which corroborates Mr. Patton's testimony regarding the shooting.

¶ 83    That said, defendant additionally contends that the evidence was insufficient because his statement was involuntary based on his age, mental ability, and the circumstances surrounding his arrest and detention. In determining whether a statement was voluntary, we must examine whether the statement was made freely and without compulsion or inducement, or whether the defendant's will was overcome at the time he confessed. See *People v. Richardson*, 234 Ill. 2d 233, 253 (2009). "[A] court must consider the totality of the circumstances of the particular case; no single factor is dispositive." *Id.* Among the factors to be considered in determining whether an inculpatory statement is voluntary are the defendant's mental ability, familiarity with the English language, age, education, and experience with the criminal justice system. See *People v. Bernasco*, 138 Ill. 2d 349, 365 (1990); see also *People v. MacFarland*, 228 Ill. App. 3d 107, 117 (1992). With juveniles, additional factors must be considered, such as the time of day and the presence of a parent or other adult concerned about the juvenile's welfare. *People v. Kolakowski,* 319 Ill. App. 3d 200, 213 (2001) (citing *In re J.J.C.,* 294 Ill. App. 3d 227, 234 (1998)). "The presence or absence of a parent is a factor to consider when determining the voluntariness of a confession; however, there is no *per se* rule that a parent or guardian be present." *J.J.C.,* 294 Ill. App. 3d at 234.

¶ 84    In this case, while some factors may serve to weigh against the voluntariness of defendant's statement, such as the time of day, his age, and his inexperience with the criminal justice system,

the totality of the circumstances indicates defendant's statement was voluntary and knowing. Most importantly, while defendant testified that he gave the statement because he was scared and wanted to go home, his mother was present while he was questioned by ASA San and when he gave his statement. Despite his testimony at trial that he did not know the meaning of various words, defendant was given *Miranda* warnings on at least three occasions. He and his mother signed his statement under the warnings and at the bottom of each page. Defendant read part of his statement aloud to ASA San, in his mother's presence. The statement went on to elaborate the meaning of some of his rights, such as "the right to remain silent meant he did not have to answer questions," he could talk to a lawyer whenever he wanted to ask questions or ask whether he should answer questions, and he could get a lawyer for free, if needed. ASA San testified that defendant was not handcuffed while she met with him and she had been informed that he was given food while he was detained. The totality of the circumstances indicate his statement was voluntary.

¶ 85    Accordingly, we cannot say that the evidence presented against defendant is "so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Givens,* 237 Ill. 2d at 334.

¶ 86    Defendant next argues that the State committed prosecutorial misconduct during closing arguments by misrepresenting the evidence at trial. Specifically, he argues there was no evidence to support the prosecutor's assertions that he whispered to his companions as Mr. Murry passed him and that Mr. Murry was intimidated by him at trial. Defendant preserved his allegation of error regarding the prosecutor's intimidation comments but acknowledges that he did not preserve the alleged error concerning defendant whispering as Mr. Murry passed the group playing basketball.

¶ 87    We first note that it is unclear whether the proper standard of review to be applied to claims of prosecutorial misconduct in closing arguments is *de novo* or an abuse of discretion. See *People v. Phillips*, 392 Ill. App. 3d 243, 274-75 (2009) (comparing *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) ("Whether statements made by a prosecutor at closing arguments were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*."), with *People v. Blue*, 189 Ill. 2d 99, 132 (2000) ("[W]e conclude that the trial court abused its discretion" by allowing various prosecutorial remarks during closing argument.)). But see *People v. Cook*, 2018 IL App (1st) 142134, ¶¶ 63-64 (finding no conflict exists regarding the standard of review and holding that the abuse of discretion standard applies "to determinations about the propriety of a prosecutor's remarks during argument," while the *de novo* standard applies to "the legal issue of whether a prosecutor's misconduct, like improper remarks during argument, was so egregious that it warrants a new trial." (Internal citations omitted.)). However, we need not resolve this issue at this time because the outcome here is the same under either standard. *Phillips*, 392 Ill. App. 3d at 275.

¶ 88    "Every defendant is entitled to a fair trial free from prejudicial comments by the prosecution." *People v. Young*, 347 Ill. App. 3d 909, 924 (2004). A prosecutor is allowed wide latitude in closing arguments, and a prosecutorial misstatement does not necessarily deprive a defendant of a fair trial. *People v. Patrick*, 205 Ill. App. 3d 222, 228 (1990). "It is of course, error for a prosecutor to misstate the evidence." *People v. Darr*, 2018 IL App (3d) 150562, ¶ 71. Even improper closing remarks do not constitute reversible error unless they result in substantial prejudice to the defendant such that absent those remarks the verdict would have been different. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). A prosecutor may comment on the evidence

presented at trial, as well as any fair, reasonable inferences therefrom, even if such inferences reflect negatively on the defendant. *Cook*, 2018 IL App (1st) 142134, ¶ 61.

¶ 89    In reviewing allegations of prosecutorial misconduct, the closing arguments of both the State and the defendant must be examined in their entirety and the complained-of comments must be placed in their proper context, while also considering their relationship to the evidence and the comments' effect on the defendant's right to a fair and impartial trial. *People v. Cisewski*, 118 Ill. 2d 163, 175-76 (1987); *People v. Williams*, 333 Ill. App. 3d 204, 214 (2002). A defendant faces a substantial burden to achieve reversal of his conviction based on improper remarks during closing argument. *People v. Meeks*, 382 Ill. App. 3d 81, 84 (2008).

¶ 90    Turning first to defendant's preserved contention, defendant alleges the State improperly argued repeatedly that Mr. Murry was hesitant to testify against defendant because he felt intimidated by him. Defendant argues the evidence instead shows defendant was intimidated by Mr. Murry because of the age disparity and their prior issues. We disagree. Rather, after viewing the State's argument that Mr. Murry was intimidated by defendant in its proper context, we find it was a reasonable inference drawn from the evidence presented. The evidence showed Mr. Murry and defendant had past unresolved issues, and Mr. Murry was arrested and charged with contempt of court in order to compel his testimony. Mr. Patton testified that he witnessed defendant and another man following Mr. Murry and yelling at him, while Mr. Murry walked quickly, as if he had been trying to get away from them. Further, the evidence showed defendant's sister Ms. Robinson sent Mr. Murry Facebook messages prior to court dates, asking whether he was going to court against defendant and calling him a "police a*** n***." While defendant points out that some evidence suggested he was intimidated by Mr. Murry, the State was permitted to argue

inferences that reflected negatively on defendant. See *Cook*, 2018 IL App (1st) 142134, ¶ 61. Viewing the comments in the relation to the evidence presented, we cannot say that it was unreasonable to argue that Mr. Murry had been intimidated by defendant.

¶ 91    Defendant's next alleges that the State improperly argued during rebuttal that he whispered to his friends when Mr. Murry walked past him. Because defendant did not preserve this issue by including it in a posttrial motion, he asks that we review it for plain error.

¶ 92    To preserve an issue for appeal, a defendant must both object at trial and include the alleged error in a written posttrial motion in order. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Here, although defendant objected to the error, he did not include it in his posttrial motion. However, we may review unpreserved issues under the plain error doctrine when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or when "(2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Before applying the plain error doctrine, however, we must determine whether an error actually occurred. *People v. Cosby*, 231 Ill. 2d 262, 273 (2008). This is because absent error, there can be no plain error. *People v. Wooden*, 2014 IL App (1st) 130907, ¶ 10.

¶ 93    In this instance, the State's argument was not based on the evidence because Mr. Murry did not testify that defendant whispered as he walked past as the trial court sustained defense counsel's objection to the State's question seeking to elicit this testimony. However, we do not find that the State's comments rise to the level of reversible error. As previously discussed, there

was substantial evidence against defendant. Mr. Patton witnessed defendant chase and shoot Mr. Murry before fleeing and subsequently identified defendant in a lineup. Mr. Murry observed defendant running away when he looked behind him after being shot from behind. Defendant gave a statement confessing to the shooting. Moreover, Mr. Murry testified that defendant "talked" to his friends as he passed them. The State's use of "whispered" rather than "talked" in rebuttal was not so significant that the verdict would have been different. See *Hudson*, 157 Ill. 2d at 441. Therefore, there was no substantial prejudice to defendant based on this comment. In light of this finding, we need not address defendant's arguments on plain error. *People v. Williams,* 193 Ill. 2d 306, 349 (2000) (there can be no plain error absent reversible error).

¶ 94     Finally, defendant argues his 10-year sentence was excessive based on his age and lack of criminal history. He acknowledges that he failed to preserve this issue before the trial court.

¶ 95     Sentencing issues are forfeited for review unless the defendant both objects to the error at the sentencing hearing and raises the objection in a postsentencing motion. *People v. Powell*, 2012 IL App (1st) 102363, ¶ 7 (citing *People v. Hillier*, 237 Ill. 2d 539, 544 (2010)). Nevertheless, forfeited sentencing issues may be reviewed for plain error. *Powell*, 2012 IL App (1st) 102363, ¶ 7 (citing *Hillier*, 237 Ill. 2d at 545). To obtain relief under the plain error doctrine in the sentencing context, a defendant must show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Wooden*, 2014 IL App (1st) 130907, ¶ 10. As previously noted, before we consider application of the plain error doctrine, we must determine whether any error occurred. *Id.* Here, we find no error.

¶ 96     In imposing sentence, a trial court must consider both "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People*

*v. Wilson*, 2012 IL App (1st) 101038, ¶ 61. We accord great deference to a trial court's sentence and will not reverse it absent an abuse of discretion. *People v. Butler*, 2013 IL App (1st) 120923, ¶ 30 (citing *People v. Stacey*, 193 Ill. 2d 203, 209-210 (2000)). A sentence within the statutory range is not an abuse of discretion unless it is "manifestly disproportionate to the nature of the offense." *People v. Jackson,* 375 Ill. App. 3d 796, 800 (2007).

¶ 97    In determining an appropriate sentence, the trial court considers such factors as "a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment." *People v. Hernandez*, 319 Ill. App. 3d 520, 529 (2001). Having observed the proceedings, the trial court, is in the best position to weigh the relevant sentencing factors. *People v. Arze*, 2016 IL App (1st) 131959, ¶121. Therefore, we do not substitute our judgment for that of the trial court simply because we would have balanced the appropriate sentencing factors differently. *People v. Alexander*, 239 Ill. 2d 205, 214 (2010).

¶ 98    Defendant was sentenced to 10 years' imprisonment, which falls within the statutory range of 6 to 30 years for aggravated battery with a firearm (720 ILCS 5/12-3.05(h) (West 2012) (aggravated battery under subsection (e)(1) is a Class X felony); 730 ILCS 5/5-4.5-25(a) (West 2012) (setting forth the sentencing range for Class X offenses)). We therefore presume the sentence was proper absent some indication that the court abused its discretion. *People v. Burton*, 2015 IL (1st) 131600, ¶ 36.

¶ 99    Although defendant argues that his sentence was excessive in light of his age and lack of criminal history, we do not find the trial court abused its discretion in sentencing defendant to 10 years' imprisonment. The record shows that in imposing sentence, the court considered the PSI,

arguments from the parties, defendant's mother's statement, the nature of the charges and the statutory factors in aggravation and mitigation. Defense counsel specifically argued that defendant was only 16 years old at the time of the offense and he had no prior criminal history. Defendant's mother, likewise, testified that this incident was an aberration. Thus, the trial court considered defendant's age and lack of criminal history in imposing sentence. Moreover, the trial court observed that defendant did not deserve a sentence near the maximum, but also found the nature of the offense did not warrant the minimum sentence. The trial court did not abuse its discretion in so concluding. The record shows defendant posed a substantial public threat when he fired 11 shots at 2 p.m. on a public street.

¶ 100    Accordingly, in light of the court's consideration of the relevant sentencing factors, we decline defendant's invitation to reweigh those factors and conclude his sentence is excessive. *People v. Burke*, 164 Ill. App. 3d 889, 902 (1987) (where the trial court properly considered relevant sentencing factors, it is not the function of a reviewing court to rebalance those factors on appeal). Because defendant failed to demonstrate any error at his sentencing hearing, there was no plain error. *Wooden*, 2014 IL App (1st) 130907, ¶ 10.

¶ 101    In sum, we find the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of aggravated battery with a firearm, the State did not commit reversible error during closing arguments, and defendant's sentence was not excessive.

¶ 102    For the reasons stated we affirm the judgment of the circuit court of Cook County.

¶ 103    Affirmed.